IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Case No. 2:15-CR-080 |
| Plaintiff, | : | Case No. 2:14-CR-127 |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| ROBERT B. LEDBETTER, *et al.* | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter comes before the Court on Defendant Johnathan Holt's motion to suppress statements that he made to law enforcement officials during a pre-indictment interview conducted on August 28, 2014, (Doc. 612). Holt argues that the admission of any statements he made during this un-*Mirandized* interview would violate his Fifth Amendment right against self-incrimination. Holt, however, was not subject to a custodial interrogation, and thus, the protections from *Miranda* never attached in the first instance. Accordingly, the Court **DENIES** Holt's motion to suppress.

## I. BACKGROUND

Holt is one of twenty defendants facing trial for his alleged involvement in the Short North Posse, an alleged criminal organization that operated in the Short North area of Columbus, Ohio, from 2005 until 2014. Holt faces four charges, including one count of murder in aid of racketeering, one count of murder through use of a firearm during and in relation to a drug trafficking crime (both for the March 24, 2010 murder of Quincy Battle), one count of use of a firearm during and in relation to a drug trafficking crime, and one count of attempted possession with intent to distribute cocaine.

1

The Court held a suppression hearing on November 9, 2015, from which the following facts were adduced. On or around August 26, 2014, law enforcement agents served Holt with a Grand Jury Subpoena to appear on August 28, 2014, at the federal courthouse located in Columbus, Ohio. The subpoena did not compel Holt to testify before the Grand Jury, but, rather, sought his fingerprints, a photograph, a handwriting exemplar, and a DNA sample. Holt appeared at the courthouse as scheduled, where he ultimately met with five law enforcement agents: Assistant United States Attorney David DeVillers, FBI Special Agent Erick Lauber, DEA Special Agent Keith Leighton, and Columbus Police Department Detectives Mitch Seckman and William Gillette.

Holt's girlfriend, Jemerrah Jones, testified at the suppression hearing that she helped escort him to the courthouse because he is wheelchair-bound and requires mobility assistance. Ms. Jones also testified that, upon entering the courthouse and passing through security, two law enforcement officers approached to escort Holt to the Fourth Floor, where the United States Attorney maintains a satellite office. Ms. Jones could not positively identify who escorted Holt to the satellite office, though she believed that one of the gentlemen was named "Mitch." Detective Seckman testified that he met Holt and Jones near the courthouse entrance to escort them upstairs, but he remembered being alone while doing so. Ms. Jones further testified that Holt asked twice why he was summoned to the courthouse and whether he needed an attorney, at which point one of the agents purportedly replied, "No, you're just here to answer a few questions, so why would you need an attorney?" Detective Seckman disputed this characterization of events. He testified that although Holt asked a general question about his summons, Holt never asked whether he needed an attorney present, and in any event, Detective Seckman simply replied that AUSA DeVillers would explain everything once they got upstairs.

2

Upon entering the satellite office, Holt was escorted into a large conference room, while Ms. Jones remained in the reception area. One of the agents told Ms. Jones that Holt would be leaving with her later that morning, as soon as they completed their business. According to Ms. Jones, a receptionist helped escort Holt into the conference room.

The Government did not record its encounter with Holt. Instead, Detective Gillette, who was handling a cold-case murder for the Columbus Police Department, prepared an "Informational Summary" afterward.[1] In that summary, Detective Gillette stated that AUSA DeVillers first advised Holt that he was the target of a criminal investigation and that his photograph would be taken. According to the Informational Summary, AUSA DeVillers also explained to Holt the following: (1) he was not in custody; (2) he would be going home that day; (3) he was free to leave and did not have to answer any questions; (4) he could have an attorney present during the discussion; and (5) it was for Holt to decide whether he wanted to speak to the agents or wait until an attorney was present. The Informational Summary indicates that Holt chose to speak with the agents without an attorney present. The agents did not, however, ask Holt to sign a written waiver of his *Miranda* rights.

AUSA DeVillers, Detective Seckman, and Detective Gillette all testified during the suppression hearing, and they each confirmed that Mr. DeVillers provided these warnings to Holt at the outset of the meeting. AUSA DeVillers testified that he wanted to ensure Holt knew his rights in case he opted to provide information to the officers; indeed, Mr. DeVillers anticipated that Holt might volunteer information regarding the Quincy Battle murder, and he wanted to ensure that the Government could use that information later if necessary.

---

[1] Detective Gillette testified that he had every intention of recording the meeting with Holt, but that, when he hit the "record" button on his camcorder, the device beeped twice and displayed a dead battery warning. AUSA DeVillers testified that he deferred to Detective Gillette on whether to record the meeting since Gillette's agency was leading the investigation into the Battle murder at the time.

3

During the interview, agents asked Holt several questions regarding the March 2010 murder of Quincy Battle. Holt, in turn, made several admissions against his interest and provided information such as the names of the other individuals involved and their respective roles in the shooting. According to AUSA DeVillers, Holt's version of the shooting began to shift during the interview, at which point Mr. DeVillers warned Holt that he probably needed an attorney present. AUSA DeVillers testified that he believed Holt was lying about his involvement in the shooting, so he advised Holt that he might wish to have an attorney present before going any further. Holt did not heed this warning, but, instead, opted to keep talking. Both parties agree that Holt's statements incriminated him in the murder.

In addition to this questioning, Detective Gillette asked Holt if he would consent to the collection of a sample of his DNA. The detective allegedly reminded Holt that he was free to leave and advised Holt that he did not have to provide the sample. In response to a question from Holt, Detective Gillette explained that any sample provided would be compared to evidence collected from the scene of the Battle murder. Holt asked Detective Gillette whether he needed a search warrant to obtain the DNA sample, at which point the detective advised Holt that "I could get a search warrant . . . if that was what he wanted me to do." Detective Gillette apparently reminded Holt that he could refuse, and that the choice was entirely up to him. At that point, Hold consented to the DNA collection.

All told, Holt remained in the satellite office for roughly an hour and forty-five minutes. Upon conclusion of the interview, Holt departed on his own volition, albeit with Ms. Jones's assistance. Officer Gillette testified that, at no point during the encounter did Holt request an attorney, express any discomfort with the interview, ask that the agents stop questioning him, or ask to leave. The other agents' testimony confirmed these essential facts.

4

Holt opted not to testify at the suppression hearing. Ms. Jones, who testified on his behalf, stated that she remained in the reception area of the satellite office during the interview, so she could not speak to any of the essential facts at issue. Ms. Jones did indicate that, at some point during the interview, one of the agents (whom she could not identify) came out to the reception area to ask her a few questions about the Battle murder, including whether she knew anything about a particular individual (whose name she could not remember), about a handgun, or about a particular date in time (again, which she could not remember). Ms. Jones replied that she did not know any of the requested information. A short time later, Holt reappeared, and the two left the courthouse together.

Holt now moves to suppress any statements that he made during this interview, arguing that law enforcement officials obtained those statements in violation of the Fifth Amendment and an internal Department of Justice policy memorandum.

## II.  LEGAL STANDARDS

The Fifth Amendment, as interpreted in *Miranda v. Arizona*, 384 U.S. 436 (1966), protects against un-counseled statements made during custodial interrogations in the absence a knowing, voluntary, and intelligent waiver of the right against self-incrimination and the right to counsel. *Frazier v. Jenkins*, 770 F.3d 485, 502 (6th Cir. 2014); *see also United States v. Hernandez*, 611 F. App'x 261, 267 (6th Cir. 2015). These protections apply only to statements made during a "custodial interrogation"—*i.e.*, during "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *see United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (explaining that *Miranda* requirements apply "only when there has been such a restriction on a person's freedom as to render him 'in custody'" (quotation omitted)).

In distinguishing between custodial interrogations, where *Miranda* applies, and non-custodial encounters, where it does not, courts must answer two "essential questions": (1) "what were the circumstances surrounding the interrogation"; and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *See Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (quotation omitted). Several factors guide this inquiry, including: "(1) the location of the interview; (2) the length and manner of questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Hinojosa*, 606 F.3d at 883; *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). In the Sixth Circuit, courts must consider the totality of the circumstances surrounding the encounter, "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *See Panak*, 552 F.3d at 465 (quotation omitted).

As the defendant seeking suppression on *Miranda* grounds, Holt bears the burden of proving by a preponderance of the evidence that he was subjected to a custodial interrogation. *See United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. 1989) (unpublished table decision) ("In a suppression hearing, the burden of persuasion rests with the party seeking to suppress the evidence."); *United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006) (same). If Holt succeeds in showing that he was subjected to a custodial interrogation, and therefore that *Miranda* warnings were constitutionally required, the Government must go forward and show that Holt's un-*Mirandized* statements were nevertheless voluntary. *See United States v. Mills*, 869 F.2d 1494, 1989 WL 19669, at *1 (6th Cir. 1989) (unpublished table decision) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

## III.  ANALYSIS

Holt has not demonstrated that he was subjected to a custodial interrogation on August 28, 2014.  Moreover, he cannot rest a suppression motion on an internal policy memorandum from the Department of Justice that, in any event, would not apply to his circumstances.  Accordingly, for the reasons explicated below, the Court **DENIES** Holt's motion to suppress.

### A.  Holt Was Not Subject to a Custodial Interrogation.

Holt's motion to suppress hinges largely on whether his pre-indictment interview with law enforcement officials constituted a custodial interrogation.  In the absence of a custodial interrogation, *Miranda* does not apply, and his statements remain admissible at trial.  *See United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).  As the operative facts and controlling cases demonstrate, no custodial interrogation occurred.

*First*, it is undisputed that Holt was not formally arrested, nor was he otherwise physically detained at any point before, during, or after the interview.  To the contrary, the evidence shows that AUSA DeVillers advised Holt that he was not in custody, that he was free to leave after his photograph was taken, and that he was not required to answer any questions.  Holt did, in fact, leave on his own accord at the conclusion of the interview.  These factors weigh in favor of finding that the interview was not custodial.  *See, e.g.*, *id.* at 951 ("Perhaps most significantly, Agent Williamson specifically advised Salvo . . . . that he was not under arrest, that he was free to leave at any time, and that he would not be arrested at the conclusion of the interview."); *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003) (holding that defendant was not subject to custodial interrogation where he "was told that he would be free to leave as soon as his name was cleared [in a law enforcement database]" and "was not arrested at the conclusion of the interview").

7

*Second*, the fact that law enforcement officials identified Holt as a target of their investigation (and informed him as much) does not transform an otherwise non-custodial encounter into a custodial interrogation.  As the Supreme Court has explained, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."  *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam); *see also California v. Beheler*, 463 U.S. 1121, 1124 n.2 (1983) (per curiam) (reiterating Supreme Court's "reject[ion] [of] the notion that the 'in custody' requirement was satisfied merely because the police interviewed a person who was the 'focus' of a criminal investigation").

*Third*, the location of the meeting—a satellite office within the federal courthouse—although perhaps "inherently intimidating," *see Salvo*, 133 F.3d at 951, was not *unduly* hostile or coercive, *see Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).  Nearly "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."  *Mathiason*, 429 U.S. at 495.  Nevertheless, the *Miranda* Rule is not implicated "simply because the questioning takes place in in the station house" or an otherwise inherently coercive location.  *Id.*  Indeed, the setting for Holt's meeting was no more coercive than the setting of other encounters where courts have determined the Fifth Amendment was not implicated.  *See, e.g.*, *Beheler*, 463 U.S. at 1122, 1125 (questioning at police station); *Mathiason*, 429 U.S. at 495 (questioning at police station); *Mason v. Mitchell*, 320 F.3d 604, 631-32 (6th Cir. 2003) (interviews at Sheriff's office and interrogation room in basement of city hall); *United States v. Ellison*, 791 F.2d 821, 823 (10th Cir. 1986) (interview at United States Attorney's office following police escort to office).

8

*Fourth*, the number of law enforcement officials present at the interview (five) likewise does not, standing alone, trigger the requirements from *Miranda*. Courts, including the Sixth Circuit, routinely find encounters with a similar number of agents present to be non-custodial. *See, e.g.*, *United States v. Conder*, 529 F. App'x 618, 619, 623 (6th Cir. 2013) (agreeing that defendant was not "in custody" during an in-home interview with three federal agents present and two more officers posted outside); *Ellison*, 792 F.2d at 822-23 (holding that no custodial interrogation occurred during interview attended by an Assistant U.S. Attorney, an FBI special agent, an IRS special agent, and a Tulsa Police Department officer); *United States v. Soteriou*, No. 5:12-cr-39, 2012 WL 5426440, at *2 (D.Vt. 2012) (finding that no custodial interrogation took place during an interview with two Assistant U.S. Attorneys, an FBI special agent, and an IRS special agent).

*Fifth*, the meeting on August 28, 2014, was not unnecessarily lengthy or prolonged. The Sixth Circuit has concluded that interviews spanning the length of a few hours do not necessarily amount to custodial interrogations. *See Mason*, 320 F.3d at 631 (agreeing, under AEDPA deference, that no custodial interrogation occurred during interview that lasted "almost four hours"); *Conder*, 529 F. App'x at 623 (holding that an encounter with law-enforcement agents that "might have lasted up to an hour and forty-five minutes" did not amount to custodial interrogation); *United States v. Mahan*, 190 F.3d 416, 420-22 (6th Cir. 1999) (affirming denial of motion to suppress on grounds that no custodial interrogation occurred where interview "lasted approximately an hour and thirty-five minutes"). Here, neither party stated definitively how long the interview lasted, though Holt's girlfriend estimated they were at the courthouse for roughly an hour and forty-five minutes, which still "compares favorably" to other Sixth Circuit cases involving encounters "deemed non-custodial." *See Panak*, 552 F.3d at 467 (collecting cases).

*Sixth*, law enforcement officials did not physically restrain Holt or restrict his freedom of movement in any way. These factors remain critical to any *Miranda* analysis and cut against Holt's arguments in favor of suppression. *See id.* (noting that officers did not handcuff or physically restrain suspect, did not otherwise limit her freedom of movement, did not brandish firearms or handcuffs, and did not threaten suspect with arrest); *Swanson*, 341 F.3d at 530 (noting that suspect "possessed unrestrained freedom of movement during the questioning"); *Salvo*, 133 F.3d at 951 (noting that suspect was "never handcuffed or otherwise physically restrained, nor was he told he was under arrest or even threatened with arrest or told to 'stay put'"); *United States v. Sivils*, 960 F.2d 587, 598 (6th Cir. 1992) (noting that suspect was free to "move about" during interview as "[n]o physical restraint or compulsion was employed").

*Seventh*, AUSA DeVillers and other officers present repeatedly advised Holt that he was not under arrest, that he was free to leave, that he was not obligated to answer any questions, and that he could consult with an attorney. These warnings also undercut Holt's argument because "a statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was 'in custody.'" *Swanson*, 341 F.3d at 350. Indeed, in *Swanson*, the Sixth Circuit described this as the "[m]ost important" factor to any custodial-interrogation analysis. *Id.* ("Most important to our analysis, though, is that Swanson was explicitly told by Fleming that he was not under arrest and did not have to speak with him if he did not choose to."). And courts consistently hold that a suspect who is given these sorts of warnings is not "in custody" for Fifth Amendment purposes. *See Mathiason*, 429 U.S. at 493, 495; *Salvo*, 133 F.3d at 951; *Silvis*, 960 F.2d at 958; *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990).

*Finally*, Holt's emphasis on the fact that he was at the interview solely by virtue of his response to a mandatory grand jury subpoena is misplaced. The Government's use of a subpoena or other compulsory process does not alter *Miranda*'s constitutional inquiry. Other courts that have addressed this issue agree that a suspect's appearance pursuant to a grand jury subpoena does not necessarily turn a non-custodial encounter into a custodial interrogation. *See Soteriou*, 2012 WL 5426440, at *5 (collecting cases and observing that courts have found that "pre-grand jury interviews . . . do not generally constitute custody for purposes of *Miranda*"). As one court explained, while a subpoena compels the recipient to *appear* at a particular place and time, it does not compel the person to submit to an interview or to give statements to law enforcement agents. *United States v. Fish*, No. 05-CR-228A, 2006 WL 3731292, at *8 (W.D.N.Y. Dec. 18, 2006) (finding that questioning conducted pursuant to grand jury subpoena in interview room adjacent to grand jury proceedings did not constitute custodial interrogation).

Other courts generally agree. *See Soteriou*, 2012 WL 5426440, at *5 (denying motion to suppress statements given by suspect who appeared at U.S. Attorney's office pursuant to grand jury subpoena; "[T]he mere fact that Defendant's presence in Burlington was mandated by a subpoena does not necessitate a finding that he was in custody."); *United States v. Manos*, No. 86 CR 573, 1986 WL 13637, at *1-2 (N.D. Ill. Nov. 18, 1986) (finding that interview conducted by Assistant U.S. Attorney and FBI agent was not custodial in nature, despite fact that suspect appeared pursuant to grand jury subpoena); *United States v. Rizzo*, 487 F. Supp. 326, 327-29 (W.D. Mo. 1980) (concluding that no Fifth Amendment violation occurred when suspect gave incriminating answers to law enforcement questioning after appearing pursuant to grand jury subpoena for handwriting exemplars and fingerprints; "Although he appeared at the FBI office in response to a federal subpoena, he was never 'in custody.'").

Under the totality of the circumstances, no custodial interrogation occurred, because a reasonable person in Holt's shoes "would have felt that he could elect to leave or terminate the interview." *United States v. Protsman*, 74 F. App'x 529, 535 (6th Cir. 2003). To be sure, this matter is not one-sided. Holt points to several factors that *might* suggest his interview constituted a custodial interrogation, including: (1) the Government's representation to Holt that he was the target of a criminal investigation, *see Stansbury*, 511 U.S. at 325; (2) the location of the meeting, which a reasonable person could view as having "an aura of coerciveness," *see Protsman*, 74 F. App'x at 534 (comparing city council chambers attached to police station as less hostile than "a jail cell or interrogation room"); (3) the length of the meeting, *compare Mahan*, 190 F.3d at 422 (hour-and-a-half interview not custodial), *with Protsman*, 74 F. App'x at 534 (describing a two-hour interview as a "factor[] favorable to [defendant's] position" that the interview was custodial); and (4) his purpose for attending the meeting in the first instance—a grand jury subpoena compelling his presence, *see Soteriou*, 2012 WL 5426440, at *5 (noting that appearance pursuant to a subpoena does not *necessarily* mean an ensuing interview is custodial).

But the balance of the ledger, including the "chief," *Protsman*, 74 F. App'x at 534, or "[m]ost important," *Swanson*, 341 F.3d at 350, factor to any custodial-interrogation analysis—the agents' repeated warnings that Holt was not under arrest and was free to go at any time—show that Holt was not in custody for *Miranda* purposes. *Protsman*, 74 F. App'x at 534-36. Holt was never formally arrested nor threatened with arrest; was free to move about during the interview; was instructed that he was free to leave at any time; and was warned that he need not answer any questions. Under these circumstances, "[h]e quite simply was not deprived of his freedom of action in any significant way," and thus, his Fifth Amendment claim fails. *Id.* at 535; *see also Mason*, 320 F.3d at 632 ("*Miranda* requires a significant deprivation of freedom.").

Indeed, in a similar case from the District Court of Vermont, that court concluded that the defendant failed to establish that he was in custody during an August 12, 2010 interview under even more coercive circumstances than Holt's.  *See Soteriou*, 2012 WL 5426440, at *7.  There, as here, the defendant showed up for a meeting with law enforcement officials under the command of a grand jury subpoena.  *Id.* at *1-2.  There, as here, the defendant met with officials in a federal building (the U.S. Attorney's main office as opposed to a satellite office in the federal courthouse).  *Id.* at *2.  There, as here, the defendant was outnumbered by law enforcement officials (4-1 in *Soteriou*, as opposed to 5-1 here).  *Id.*  There, as here, the defendant was interviewed over the course of hours ("approximately four hours" in *Soteriou*; roughly an hour or an hour and forty-five minutes here).  *Id.*  There, as here, the defendant was not placed under formal arrest and left the meeting to return home unescorted.  *Id.*  And there, as here, the agents never physically restrained the defendant or made a show or threat of force.  *Id.* at *5.  Critically, however, in *Soteriou*, "the Government did not affirmatively inform [defendant] that he was free to leave."  *Id.*  Rather, "nobody affirmatively conveyed the message that [defendant] was *not* free to leave" either.  *Id.* (emphasis added) (brackets and quotation omitted).

Thus, despite an equally coercive location, a significantly longer interview, and the absence of *any* warning that the defendant was free to leave, the court still found, under the totality of the circumstances, that the interview was not a custodial interrogation.  *Id.* at *7 (finding no *Miranda* violation).  The court relied on the fact that the defendant was not arrested or threatened with arrest, was not placed under physical restraints or threatened with a show of force, and was never affirmatively led to believe that he could not leave whenever he pleased.  *Id.* at *5-7.  *Soteriou* shows that, under the totality of the circumstances, a reasonable person in Holt's position would have felt free to terminate the interview at any time too.  *Id.* at *7.

Holt simply has not shown by a preponderance of the evidence that he was subjected to a custodial interrogation.  *See Donaldson*, 493 F. Supp. 2d at 1003.  As such, Holt was not "in custody" for *Miranda* purposes, and his motion to suppress on that ground must fail.  *See Panak*, 552 F.3d at 465.

### B.  The DOJ Policy Memorandum Does Not Provide a Basis for Suppression.

Holt also points to a Department of Justice ("DOJ") policy memorandum in support of his motion to suppress.  In that memorandum, Deputy Attorney General James M. Cole established a "presumption" that federal agencies, including the FBI and all United States Attorneys, "will electronically record statements made by individuals in their custody" under certain circumstances.  DOJ Memorandum on Policy Concerning Electronic Recording of Statements 1-2 (May 12, 2014) ("DOJ Mem.") ("There is a presumption that the custodial statement of an individual in a place of detention with suitable recording equipment, following arrest but prior to initial appearance, will be electronically recorded, subject to the exceptions defined below.").  The memorandum also "encourages agents and prosecutors to consider electronic recording in investigative or other circumstances where the presumption [in favor of recording *custodial* interrogations] does not apply."  *Id.* at 1.  Because the policy memorandum took effect on July 11, 2014, it governed Holt's meeting with law enforcement officials on August 28, 2014.  *See id.* at 4.

Holt now argues that "[n]o recording was made of [his] interview," in violation of Deputy Attorney General Cole's policy memorandum, thus warranting suppression of his statements.  (Doc. 612).  The DOJ policy memorandum does not, however, provide a basis to suppress Holt's statements.

*First*, although the memorandum establishes a presumption in favor of recording "interviews of persons in [federal] custody," non-custodial interviews "are excluded from the presumption." DOJ Mem. at 2. Further, the presumption attaches only when an interviewee is in a "place of detention," which is defined as "any structure where persons are held in connection with federal criminal charges." *Id.* And the presumption applies only to individuals in custody "following arrest but who have not yet made an initial appearance." *Id.* As this Court's findings make clear, Holt was not in federal custody, was not being held in a place of detention, and was not interviewed between his arrest and initial appearance. Thus, the DOJ policy memorandum did not establish a presumption in favor of recording the August 28, 2014 interview.

True enough, the memorandum also "*encourages* agents and prosecutors to *consider* electronic recording in investigative or other circumstances where the presumption does not apply"—*i.e.*, in non-custodial settings. *See id.* at 1 (emphasis added). But Holt cannot base his motion to suppress on a discretionary decision contained in an internal policy memorandum that itself merely establishes a presumption in favor of recording.

*Second*, as the policy memorandum makes clear, it was issued "solely for internal Department of Justice Guidance," not to create or confer any rights on individuals. *Id.* The memorandum expressly states that "[i]t is not intended to, does not, and may not be relied upon to create any rights or benefits, substantive or procedural, enforceable at law or in equity in any matter, civil or criminal, by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person . . . ." *Id.* at 1-2. This language precludes any relief based on an alleged violation of the policy memorandum. *See United States v. Nagy*, 760 F.3d 485, 490 (6th Cir. 2014) (holding that defendant challenging his sentence could not rely on a similar DOJ policy memorandum in light of similar disclaimer).

15

*Finally*, even if the Government acted at odds with its own policy, suppression of Holt's statements would not be warranted. The exclusionary rule applies only to *constitutional* violations and, in limited instances, to statutory violations. *See United States v. Caceres*, 440 U.S. 741, 754-55 (1971) (reversing application of exclusionary rule based on enforcement of agency regulations; "[O]ur precedents enforcing the exclusionary rule to deter *constitutional* violations provide no support for the rule's application in this case." (emphasis added)); *see also United States v. Abdi*, 463 F.3d 547, 555-56 (6th Cir. 2006) (explaining limited instances where statutory violations suffice to invoke exclusionary rule). An alleged violation of a DOJ policy memorandum falls well short of such an injury.

## IV.  CONCLUSION

For these reasons, the Court **DENIES** Holt's motion to suppress, (Doc. 612).

**IT IS SO ORDERED.**

                            <u>s/ Algenon L. Marbley</u>
                            **ALGENON L. MARBLEY**
                            **UNITED STATES DISTRICT JUDGE**

**DATED:  November 12, 2015**